# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STEVEN JACKSON,

    *Plaintiff,*

    v.

LORENZO SAMUELS, *et al.*,

    *Defendants.*

Case No. 24-cv-741-ABA

## MEMORANDUM OPINION

In the 1960s, a group of singers in Baltimore formed The Softones. The group went on to have many successful years of performances and popular recordings. This case arises because two individuals dispute which of them is the rightful owner of the Softones trademark: Plaintiff Steven Jackson, one of the original Softones, or Defendant Lorenzo Samuels, whom one of the other original members, Byron Summerville, invited to perform as a "Softone" starting in 2009. Mr. Jackson contends he has always remained a member of the group, and as the only surviving original member now holds the group's trademark rights. Mr. Samuels contends Mr. Jackson left the group sometime before 2009, when Mr. Samuels joined, and thus lost any common law trademark rights from his earlier years in the group.

The parties have filed motions for summary judgment. In the words of The Softones' hit 1973 single, Mr. Jackson and Mr. Samuels each claims, "I'm Gonna Prove It."[1] But at this stage, genuine factual disputes preclude the Court from granting summary judgment to either side (or to another defendant, a restaurant that advertised

---

[1] The Softones, I'm Gonna Prove It/Guns (Vinyl Record, Avco Records Corp. 1973); *Best Selling Soul Singles*, Billboard, Apr. 14, 2026, at 26.

one of Mr. Samuels's performances). A trial will be necessary for a factfinder to assess credibility and otherwise weigh the evidence. Accordingly, the motions will be denied.

## I.    BACKGROUND

Although there are vehement disputes about the membership and activities of The Softones after the mid-2000s, the parties do not dispute the group's membership and activities before then, during its first several decades. The original members of The Softones met in the 1960s while they were in junior high school. ECF No. 63-10 ¶¶ 4–6. Marvin Brown invited Mr. Jackson to join the nascent group after seeing him perform during a school talent show. *Id.* The Softones' line-up was somewhat "fluid" during its early years, at least in part due to the Vietnam War, but eventually became settled during the mid-1970s with five members: Jackson, Brown, Elton Lynch, Byron Summerville, and Matthew Fenwicks. *See id.* ¶ 6. In the 1970s, '80s, and '90s, the group recorded several albums in the soul genre, regularly performed live, and made television and film appearances. *See id.* ¶¶ 11–14; ECF Nos. 63-8; 63-12.

The parties dispute the group's roster over the past two decades. In Mr. Jackson's telling, he has remained a member of The Softones even as each original member left or passed away, and has continued to perform in The Softones continuously—sometimes with less frequency, but with sufficient regularity that no reasonable factfinder could conclude that he ever "left" the group. ECF No. 70-1 ¶ 3. As for the other original members, Mr. Fenwicks left the group relatively early in its history to pursue another career.[2] ECF No. 63-10 ¶ 15. Mr. Summerville died in 2012, but Mr. Jackson contends

---

[2] It is not clear from the record whether Mr. Fenwicks has since died or merely left the group a long time ago. But either way, the parties agree that he left the group at some point, and has no claim to trademark rights that would affect the analysis below.

that he had been "dismissed from the group several years earlier." *Id*. Work was occasionally slow for The Softones over the past 20 years, and there is no dispute that Mr. Jackson would sometimes perform with other groups. But he maintains that he has never stopped being a member of and performing with The Softones. *Id*. ¶ 14. Following the deaths of Mr. Brown in 2020 and Mr. Lynch in 2022, Mr. Jackson now performs as The Softones with two new members: Johnnie Johnson and Michael Muse. ECF Nos. 63-9; 63-10 ¶¶ 3, 15.

Mr. Samuels, who is representing himself, tells a different version of the past 20 years in Softones history. Mr. Samuels's factual claims about his membership in the group are almost entirely disputed by Mr. Jackson. Mr. Samuels contends that he was invited to join The Softones in 2009 by Byron Summerville, prior to Mr. Summerville's death in 2012. ECF No. 67 at 1. Mr. Samuels disputes Mr. Jackson's claim that Mr. Summerville had been "dismissed" from The Softones by 2009, when Mr. Summerville and Mr. Samuels performed together. *Compare* ECF No. 67 at 1 (Mr. Samuels stating in his brief that he was "invited to join 'The Softones' by Byron Summerville in 2009) *with* ECF No. 63-10 ¶ 15 (Mr. Jackson's declaration, stating "Byron Summerville died in 2012 although he had been dismissed from the group several years earlier"). Mr. Samuels claims that when Mr. Summerville invited him to join the group, *Mr. Jackson* was the one who had "left" The Softones, and had done so several years earlier to perform instead with a group called The Fonics. ECF No. 67 at 2; *see also* ECF No. 75-1 (declaration of Harry Easley stating that he "was the lead singer of 'The Softones' from 2006-2008" and that Mr. Jackson was not in the band at that time, and that Mr.

Samuels took over as lead singer in his place around 2008).[3] Mr. Jackson specifically

disagrees on this point, contending that he never departed the band, and rather it was

Mr. Summerville who was fired. ECF No. 63-10 at 3. Mr. Jackson admits that he

performed with The Fonics in 2008–2012 but contends this was to "supplement" his

work with The Softones, not to replace it. ECF No. 70-1 ¶ 4. Mr. Samuels, for his part,

contends that he continued to perform in his version of The Softones after Mr.

Summerville's death in 2012, and that he has continuously performed with his Softones

through the present, sometimes performing as "The Softones Revue." ECF No. 63-14 at

22.

In December 2021, it came to Mr. Samuels's attention that no trademark was

registered for "The Softones." He saw that as an opportunity, and applied to register

federal wordmarks for THE SOFTONES and THE SOFTONES REVUE as applied to live

performances by a musical group. *See* ECF No. 63-14 at 47–51; U.S. Trademark

Application Serial No. 97/192,796; U.S. Trademark Application Serial No. 97/193,279.

Mr. Jackson learned of these applications several months later and filed his own

registration application for The Softones mark. *See* ECF No. 63-14 at 55–59; U.S.

Trademark Application Serial No. 97/285,512. Mr. Jackson's application was suspended

by the U.S. Patent and Trademark Office (PTO) because Mr. Samuels's applications

"ha[d] an earlier filing date" and, if Mr. Samuels's application was registered, the PTO

---

[3] Mr. Easley's declaration was originally rejected from the docket because Mr. Easley
himself submitted it, and he is not a party to this case. At the motions hearing, it became
clear that Mr. Samuels was not aware that this declaration had been rejected. Because
Mr. Samuels is *pro se*, the Court will forgive this procedural error and direct the Clerk of
Court to docket Mr. Easley's declaration. Counsel for Mr. Jackson also stated at the
hearing that Mr. Easley was not properly disclosed as a witness. Whether Mr. Easley will
be permitted to testify at trial is not presently before the Court.

may "refuse registration" of Mr. Jackson's mark because of "a likelihood of confusion." ECF No. 63-14 at 68. The PTO subsequently awarded Mr. Samuels registration number 7,076,872 for THE SOFTONES (the '872 Mark) and 7,237,429 for THE SOFTONES REVUE (the '429 Mark) in December 2023. *See* ECF No. 63-14 at 47–51.

A few months after the PTO approved Mr. Samuels's registration, Mr. Jackson sued Mr. Samuels for trademark infringement and to cancel the registrations. Mr. Jackson's amended complaint asserts nine counts. ECF No. 4. He later voluntarily dismissed three of them. ECF No. 32. The remaining counts are:

- trademark infringement and unfair competition under the Lanham Act (specifically, 15 U.S.C. § 1125(a)) and Maryland common law (counts 1 and 2) (the "Infringement Counts"), and

- cancellation of Mr. Samuels's THE SOFTONES and THE SOFTONES REVUE marks due to likelihood of confusion (counts 6 and 8) and/or due to fraud (counts 7 and 9) (the "Cancellation Counts").

While the main dispute is between Mr. Jackson and Mr. Samuels, there is also a B-side. Mr. Jackson is suing a seafood restaurant in Gambrills, Maryland, Crofton Princess LLC (d/b/a "Blue Dolphin"), for infringement. Mr. Jackson contends that the Blue Dolphin hosted at least three musical performances by Mr. Samuels's Softones and advertised those performances on social media. ECF No. 63-4. The last of those performances took place on March 28, 2024. *Id.* at 6. Prior to that performance, counsel for Mr. Jackson emailed the Blue Dolphin informing it of Mr. Jackson's common law trademark and Mr. Samuels's alleged infringement. ECF No. 4-6 at 6–7. Blue Dolphin took down the advertisement in question (and took it down a second time after an employee re-posted it without knowing about the communications with Mr. Jackson's

counsel), but apparently did not cancel the performance, in reliance on Mr. Samuels's promoter's statement that Mr. Samuels had a trademark for The Softones. *Id.* at 1–5; ECF No. 4 ¶¶ 75, 79.

Mr. Jackson had also initially named Shelton Price and The Cornelius Project LLC as Defendants. ECF No. 4. Mr. Price and The Cornelius Project (of which Mr. Price is a member) promoted, advertised, and sold tickets for certain performances by Mr. Samuels. ECF No. 4 ¶¶ 3–4, 24; ECF No. 72 at 4. Mr. Jackson has since entered a stipulated injunction with those defendants, which the Court granted, and has voluntarily dismissed his claims against these parties. ECF No. 73.

All three remaining parties have moved for summary judgment. Mr. Jackson has moved for summary judgment on the Infringement Counts (Counts 1 and 2), and the Cancellation Counts based on likelihood of confusion (Counts 6 and 8); he has not moved for summary judgment on the Cancellation Counts based on fraud (Counts 7 and 9). ECF No. 63. Mr. Samuels has moved for summary judgment on all of Plaintiff's counts, and seeks an injunction to prevent Mr. Jackson from using the registered Softones marks. ECF No. 67. Mr. Samuels argues that Mr. Jackson left The Softones and thus lost ownership over the mark. *Id.* at 2. The Blue Dolphin has moved for summary judgment in its favor on Mr. Jackson's claims, arguing that it cannot be "secondarily liable" even if Mr. Samuels committed trademark infringement. ECF No. 65.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party meets its burden when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case" and

when the nonmovant bears "the burden of proof at trial." *Celotox Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-moving party fails to confront the motion with "sufficient evidence . . . for a jury to return a verdict for that party," the movant is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotox*, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). In making this determination, the Court views all facts, and all reasonable inferences drawn from those facts, in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 115 F.4th 266, 277 (4th Cir. 2024) (quoting *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011)).

## III. DISCUSSION

### A. Does Mr. Jackson or Mr. Samuels own the Softones trademark?

Mr. Jackson has sued Mr. Samuels for infringement and unfair competition under 15 U.S.C. § 1125(a) and Maryland common law, and to cancel his trademark registration. ECF No. 4 ¶¶ 80–149. And through their cross-motions for summary judgment, Mr. Jackson and Mr. Samuels each contends that he is the sole rightful owner of the Softones trademarks.

### 1.    The undisputed elements of Plaintiff's claims

Before getting to the question of ownership, several points pertinent to Mr. Jackson's claims are not in dispute. Though section 1125(a) is labeled as targeting "false designations of origin," it provides in substance "a federal cause of action for trademark infringement" for unregistered marks. *Matal v. Tam*, 582 U.S. 218, 225 (2017). "To establish trademark infringement under the Lanham Act, a plaintiff must prove: (1) that it owns a valid mark; (2) that the defendant used the mark 'in commerce' and without plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012) (quoting 15 U.S.C. § 1114(a), the federal provision for infringement of *registered* marks). "The Fourth Circuit has noted that the test for a false designation of origin/unfair competition claim is essentially the same as the test for trademark infringement." *Entrepreneur Media, Inc. v. JMD Ent. Grp., LLC*, 958 F. Supp. 2d 588, 594 (D. Md. 2013) (applying the same four-factor standard to claims under §§ 1114 and 1125); *see also JFY Props. II LLC v. Gunther Land, LLC*, Case No. 17-cv-1653-ELH, 2019 WL 4750340, at *15 (D. Md. Sept. 30, 2019) ("The standards for asserting Lanham Act claims for trademark infringement and unfair competition based on the inappropriate use of a mark are largely the same."). "This test also applies to claims for trademark infringement and unfair competition under Maryland law." *Original Dells, Inc. v. Soul 1 Ent. Grp.*, Case No. 23-cv-95-TDC, 2024 WL 4052818, at *7 (D. Md. Sept. 5, 2024), *report and recommendation adopted*, 2024 WL 4892587 (D. Md. Sept. 25, 2024).

The record does not reflect any dispute over three of these four elements as concerns Mr. Jackson's claims against Mr. Samuels. Mr. Samuels performed as The Softones without Mr. Jackson's authorization and received payment for his musical performances. This satisfies elements 2 and 3, as Mr. Samuels's performances entailed using the mark in commerce and in connection with services rendered. *See* 15 U.S.C. § 1127 ("a mark shall be deemed to be in use in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce.").

Element 4, likelihood of confusion, is also not in dispute. To evaluate likelihood of confusion, courts in the Fourth Circuit look to a nine-factor test:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

*George & Co. LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009). A protracted analysis of confusion under the factors is not necessary here. The "Softones" word marks used by Mr. Samuels and Mr. Jackson are identical, and are used in the same geographic market (Baltimore/Washington, D.C.) and economic market (musical services). Mr. Samuels has not contested likelihood of confusion, and has himself argued that Mr. Jackson's use of the mark has caused confusion with *his* own group. *See* ECF No. 63-14 at 44. Thus, confusion is not disputed here. *See Wonderbread 5 v. Gilles*, 115 U.S.P.Q.2d 1296, 2015 WL 4380986, at *7 (T.T.A.B. 2015) ("[W]hen the parties are

claiming rights in the same mark for the same goods or services, likelihood of confusion is inevitable.").

So the central dispute is over element 1: ownership.

### 2.    Legal standards: ownership of musical group trademarks

"At common law, trademark ownership is acquired by actual use of the mark in a given market." *Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 267 (4th Cir. 2003). "The first user, then, to appropriate and use a particular mark—the 'senior' user—generally has priority to use the mark to the exclusion of any subsequent— or junior—users." *Id.* at 268. Mr. Jackson claims that he has a senior, common law right to the Softones trademarks because he has been performing with the group since it began and is the sole surviving member. Mr. Samuels contends that Mr. Jackson's case fails on the ownership element. Mr. Samuels essentially contends that (1) Mr. Jackson has no common law rights in the Softones mark because he left the group in the 2000s and (2) because Mr. Jackson lacks a pre-existing, senior common law right, Mr. Samuels's federal registration gives him priority.

At the outset, the Court notes that Mr. Jackson's failure to register a trademark in The Softones is not decisive, because he claims a senior common law mark. "Even if a trademark is not federally registered, it may still be enforceable under [15 U.S.C. § 1125(a)], which creates a federal cause of action for trademark infringement." *Matal v. Tam*, 582 U.S. 218, 225 (2017); *see also Marcon, Ltd. v. Helena Rubenstein, Inc.*, 694 F.2d 953, 956 (4th Cir. 1982) ("[A] party claiming prior use of a trademark may seek to cancel another party's registration of the mark under § 14 of the Lanham Act."); *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 523 (4th Cir. 2002) ("A party claiming prior use of a trade or service mark may, as LLC does here, seek to enjoin a

defendant's use of its registered mark and cancel that defendant's registration of the mark under § 14 of the Lanham Act."). Mr. Samuels is not entitled to summary judgment merely because he holds a federal registration, as he has argued. *See* ECF No. 67 at 3.[4]

Because federal registration alone does not establish ownership when a senior user claims pre-registration common law rights, the key question is whether Jackson had a senior common law claim to the Softones mark. Answering this question involves untangling the complex problem of common law trademark ownership in the context of musical groups with multiple members and changing rosters. Though the Fourth Circuit and Maryland courts have not addressed this issue,[5] several other courts have.

In *Robi v. Reed*, the Ninth Circuit had to determine which member of The Platters, an R&B vocal group, had the superior claim to trademark ownership over the ensemble's name. 173 F.3d 736 (9th Cir. 1999). Synthesizing the holdings of several cases that addressed competing claims among musicians who performed with groups at different times, the Ninth Circuit concluded that "members of a group do not retain

---

[4] Mr. Samuels also contends that Mr. Jackson lacks common law rights because he was not an original Softones member but was instead "recruited" to the group in the late 1960s when Mr. Jackson and the other Softones were in junior high school. *See* ECF No. 67 at 2–3. This argument is not successful either. Mr. Samuels does not appear to dispute that Mr. Jackson spent at least 30 years as a Softone and was with The Softones when it first became prominent in the mid-1970s. Under the music ensemble trademark ownership cases discussed below, Mr. Jackson's association with and control over The Softones' musical services is enough to give him common law trademark rights (assuming he did not leave the band in the mid-2000s—more on that shortly).

[5] The Court is aware of only one district court opinion within the Fourth Circuit related to music ensembles and trademarks: *Five Platters, Inc. v. Purdie*, 419 F. Supp. 372 (D. Md. 1976). That case involved agreements between the parties about the use and ownership of the trademarks, *id.* at 378–79, so it is of limited relevance to the question here regarding ownership of the mark as a matter of common law.

rights to use the group's name when they *leave* the group," because "there is no inalienable interest at stake that would attach to the departing member." *Id.* at 739–40 (emphasis added). By contrast, "a person who remains continuously involved with the group and is in a position to control the quality of its services retains the right to use of the mark." *Id.* at 740. Applying these standards, the court concluded that the rights were held by the defendant, Herb Reed, "who founded the group and is the only person who has remained and performed with it from its inception." *Id.* Mr. Reed had that right rather than Paul Robi (or Mr. Robi's assignee) because although Mr. Robi had been a member of The Platters for a number of years, he had "severed his relationship with the group in 1965, when he was arrested and convicted of felony narcotics possession charges." *Id.* at 738. The *Robi* court did not flesh out what it means for an individual member to "leave" a group because in that case there was no dispute that Mr. Robi had in fact entirely ceased performing with the group: he had not only gone to prison but also did not attempt to return to the group after he was released or claim that he had done so. *Id.* at 738.

*Robi* is consistent with a similar, more recent case from the Eleventh Circuit involving a funk group, The Commodores. *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114 (11th Cir. 2018). In that case, original members of The Commodores sued another original member, Thomas McClary, who had left the group over twenty years prior to the suit. *Id.* at 1121–22. Drawing on *Robi* and other cases on trademark ownership and control, the *Commodores* court concluded that the "continuing members of the original group" owned the trademark rights rather than Mr. McClary, who had ceased performing with the band over 25 years earlier, attempted to reunite with the band, and then formed his own group using the "Commodores" name. *Id.* at 1133. The

Court held that "common-law rights to the marks remained with the group members who continued to use and exert control over the group 'The Commodores,' and no reasonable juror could have found otherwise." *Id.* at 1132–33.

Several key principles emerge from these cases, as well as from the other persuasive authorities and scholarly sources addressing similar issues. *See, e.g.*, *Bell v. Streetwise Recs., Ltd.*, 640 F. Supp. 575 (D. Mass. 1986); *Leftenant v. Blackmon*, Case No. 18-cv-1948-EJY, 2023 WL 362663, at *2–6 (D. Nev. Jan. 23, 2023); *Wonderbread 5*, 115 U.S.P.Q.2d 1296, at *7–14; 2 McCarthy on Trademarks and Unfair Competition § 16:45 (5th ed.) (hereinafter "McCarthy on Trademarks").

First, in the absence of an agreement to the contrary, a music ensemble's trademark rights remain with the ensemble itself. *See Robi*, 173 F.3d at 739–40; *Commodores*, 879 F.3d at 1131–32. The right to enforce the trademark stays with those individuals currently affiliated with the ensemble who "control[] the quality and reputation of the band" and have authority over "performances and business decisions." *Commodores*, 879 F.3d at 1133. But the individual trademark rights of the members do not travel with them. Instead, they are akin to a contingent property right that exists only as long as a band member is still in the group. Thus, when a musician leaves a band, they "[leave] behind [their] common-law rights to the marks." *Commodores*, 879 F.3d at 1121; *see also Robi*, 173 F.3d at 739 ("[M]embers of a group do not retain rights to use the group's name when they leave the group.").

These rules follow from the fundamental purpose of trademark law, which is to avoid consumer confusion by protecting single, identifiable sources of commercial goods and services. *See Vidal v. Elster*, 602 U.S. 286, 300 (2024) ("[T]rademarks developed historically to identify for consumers who sold the goods (the vendor) and who made the

13

goods (the manufacturer). In that vein, a basic function of trademark law has always been to prohibit confusion as to the source of good[s] or services.") (quotations and citations omitted); *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 147 (2023) ("Confusion as to source is the bête noire of trademark law."); *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 381 (4th Cir. 2003) ("[A]voidance of consumer confusion is the ultimate end of all trademark law."). Unlike other forms of intellectual property such as copyrights or patents, courts disfavor "fragmented" ownership of trademarks to avoid giving rise to more than one source associated with the same mark. *See* McCarthy on Trademarks § 16:40.[6] To allow departing individual members of a band to take trademark rights with them would create multiple fragmented sources of the trademarked musical services, leading to consumer confusion as to which group is the authentic version—i.e., which group is *the* The Softones. *See Crystal Ent. & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1324 (11th Cir. 2011) (explaining, in a music ensemble case, that "[t]rademark law ordinarily does not permit two entities to share a mark due to the consumer confusion that would ensue."); *Bell v. Streetwise Recs., Ltd.*, 761 F.2d 67, 76 (1st Cir. 1985) ("When arguing parties are, in a sense, both responsible for the success of a name, a court may

---

[6] Some district courts have appeared more open to the concept of fragmented trademark co-ownership when presented with cases where the members of a band had entered an agreement allowing for individual use and/or separate rights. *See, e.g.*, *Lightfoot v. DeBruine*, Case No. 20-cv-666-PHX-DJH, 2023 WL 2665732, at *3, 8–12 (D. Ariz. Mar. 28, 2023); *Piccari v. GTLO Prods., LLC*, 115 F. Supp. 3d 509, 511–17 (E.D. Pa. 2015). No such agreement is in the record here, and the opinions in those cases recognize trademark law's general, default preference for unified ownership. Additionally, the parties in those cases were both original members, unlike the suit here between an original band member and a party who joined later, and where the parties never performed together.

find it difficult to decide which, in fact, 'owns' the name; the temptation may be great to say 'both own it' or try to 'divide' the name among them. The public interest, however, normally requires an exclusive award.") (Breyer, J., and Coffin, J., jointly concurring). The Platters, the ensemble at the center of the *Robi* case, is a prime example of this issue: their rotating musical roster spawned numerous splinter groups with "Platters" in the name, as well as over 40 years of litigation across several state and federal jurisdictions. *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1243–45 (9th Cir. 2013).

If leaving a band has such legal import for whether an individual member may perform under the band's name (or have a contingent right to enforce the band's trademark rights), that leads to an obvious question with significance for this case: what does it mean to "leave a band" (or here, a vocal ensemble)? The cases that have confronted this issue generally look to factors such as whether a musician manifests an explicit intent to leave; ceases creative activities with the band such as rehearsing, songwriting, performing, and recording; and/or no longer participates in business decisions. For example, in *Commodores*, the court held that Mr. McClary did not have a right to perform as a "Commodore" because he "did not join the group to make business decisions about performance schedules or recordings," "stopped writing songs with the group," and "was not involved with the group's decisions about performances, whether about the songs to be performed, the personnel to be involved, or the production details of the shows." 879 F.3d at 1133–1134. In *Leftenant*, the court held that various band members lost their common law trademark rights by ceasing to perform or record with the band, "undisputed[ly] resign[ing]," and/or having "no involvement with the management" of the band. 2023 WL 362663, at *3–5. On the other end of the spectrum,

original band members who have remained continuously with the band and still participate in creative and business decisions will almost always have the right to perform under the band's name and enforce the band's trademarks. *See Robi*, 173 F.3d at 740; *Commodores*, 879 F.3d at 1132–133.

So if (1) during a group's existence its common law trademarks belong to the current group and (2) a member who leaves the group loses the right to enforce the trademarks, where does that leave the Softones trademark? Can Mr. Jackson enforce the trademark and thereby preclude Mr. Samuels from performing as a Softone and collect damages? Or is Mr. Samuels the one with the exclusive right to perform as a Softone?

### 3. Applying those standards, genuine factual disputes do not permit deciding at this stage whether Mr. Jackson or Mr. Samuels is the rightful owner of the Softones trademark

To analyze these questions, it helps to divide the Softones' history into three periods: (1) from its formation through the mid-2000s, (2) from the mid-2000s to around 2013, and (3) from 2013 to the present. It is the middle period that is most relevant for current purposes. During that period, it is undisputed that Mr. Jackson was not frequently performing as a Softone, but rather periodically as a Fonic, and Mr. Samuels was performing as a "Softone" with one of the true Softones' original members, Byron Summerville. Beyond that, however, the evidence is disputed in two critical dimensions that preclude granting summary judgment to either side.

### i. Did Mr. Jackson "leave" the Softones (in 2006 or any other time)?

The first critical disputed factual question is whether Mr. Jackson left the Softones. This is important because, as noted above, if Mr. Jackson "left" the Softones

within the meaning of cases like *Commodores*, *Robi*, and *Leftenant*, his trademark rights in the ensemble would extinguish, remaining with the ensemble as an entity.

Mr. Samuels contends Mr. Jackson did leave the Softones, in or about 2006. And there is evidence supporting that contention. Mr. Samuels himself states that Mr. Jackson left The Softones; that statement appears not only in his summary judgment brief but also in his interrogatory responses. *See* ECF No. 67 at 2, 5; ECF No. 41 ¶ 4. "[S]elf-serving declarations can defeat summary judgment." *Harrell v. DeLuca*, 97 F.4th 180, 187 (4th Cir. 2024); *see also* Fed. R. Civ. P. 56(c)(4) (allowing the court to consider affidavits or declarations). And although Mr. Samuels's brief and cross-motion for summary judgment are not sworn declarations, the Court will also consider these statements for purposes of summary judgment because Mr. Samuels is self-represented. *See Folse v. Hoffman*, 122 F.4th 80, 84 (4th Cir. 2024) ("[T]rial courts are encouraged to liberally treat procedural errors made by *pro se* litigants.") (quoting *Bauer v. Commissioner*, 97 F.3d 45, 49 (4th Cir. 1996)); *Hammock v. Andoh*, Case No. 21-cv-796-DLB, 2025 WL 2402198, at *1 n.1 (D. Md. Aug. 19, 2025) (crediting a pro se litigant's "statements in his opposition" as evidence for summary judgment).

Even if the Court did not credit Mr. Samuels's statements in his opposition, he makes similar claims in his interrogatory responses: "I never performed with Marvin Brown and Steven Jackson as a member of the Softones. As a matter of fact, Brown and Plaintiff were already no longer members of the group when I joined in 2009." ECF No. 41 ¶ 4; *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). These statements are also consistent with the excerpts of Mr. Samuels's deposition provided by the parties, in which he testified that he was invited to join The Softones by Mr. Summerville and

considers his ensemble to still be the authentic Softones. *See* ECF No. 63-14 at 34 ("[W]e are not a tribute group. We are The Softones . . . [T]hat's how I was hired as."). Plus there is the signed declaration of a witness, Harry Easley. ECF No. 75-1. Mr. Easley states that he "was the lead singer of 'The Softones' from 2006-2008" and that Mr. Jackson was not in the band at that time. *Id.* Mr. Easley left the group in approximately November 2008, and states that Mr. Samuels became the lead singer thereafter and has remained the lead singer. *Id.*

Further, while Mr. Jackson has submitted documentary evidence of his performances with The Softones, none of these materials appear to show activities between 2006 and 2012. *See* ECF No. 63-8 at 34 (a performance contract dated December 17, 2005); ECF No. 63-11 at 4 (advertising a performance for The Softones with Mr. Jackson on March 16, 2013). This apparent gap from 2006 to 2012 coincides with the same period in which Mr. Samuels contends that Mr. Jackson was not only not *in* the band, but had *left* the band. Mr. Samuels's version of the timeline—that Mr. Jackson left The Softones around 2006—is not contradicted by the documentary record in this respect. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 626 F. Supp. 3d 814, 837 (D. Md. 2022) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record . . . a court should not adopt that version.") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

From this evidence—even if it were just Mr. Samuels's own statements—a reasonable juror could conclude that Mr. Jackson left the Softones as of 2006, that he was no longer in the band when Mr. Samuels joined in 2009, and that, because leaving the band extinguished his common law rights, Mr. Jackson does not have the senior claim to the Softones mark to enforce against Mr. Samuels. And that conclusion would

18

apply even if Mr. Jackson later returned to performing with a splinter version of The Softones. *See Commodores*, 897 F.3d at 1134 ("Even if the evidence could support a finding that McClary rejoined the group—and in no way does it afford that inference—it could not support the conclusion that McClary should be able to use the group's name while performing separately from the group.").

But Mr. Jackson also has evidence supporting his contention that he never "left" The Softones, but rather was merely taking a hiatus from performing as a Softone because demand during the mid-2000s for The Softones' tones was, well, soft. Mr. Jackson has submitted numerous posters, news articles, recordings, and performance contracts showing his activities with The Softones. *See* ECF Nos. 63-3, 63-5, 63-8, 63-11, 63-12. The declaration of Mr. Jackson's manager, Ms. Jackson-Hodges, adds that during roughly the same time as the critical "middle period," from 2008 to 2012, Mr. Jackson performed with Mr. Brown and a third musician in another vocal R&B group called The Fonics. ECF No. 63-7 ¶ 9. Ms. Jackson-Hodges states that the reason Mr. Jackson was performing with The Fonics was not that he had left The Softones, but rather because "demand for live performance work for The Softones was not particularly robust." *Id.* Ms. Jackson-Hodges goes on to maintain that Mr. Jackson did not "stop performing as The Softones," *id.*, and points out that musicians can, of course, perform with multiple groups. Based on this evidence, a reasonable factfinder may very well conclude that Mr. Jackson's performances with The Fonics were essentially a side gig, and that Mr. Jackson was simultaneously a "member" of both groups.

So there is evidence from which a reasonable jury could go either way on the question of whether Mr. Jackson left The Softones in approximately 2006. And under the standards articulated above, this factual question is material to ownership: if Mr.

Jackson left The Softones ensemble, he left behind his trademark rights and would no longer have a senior claim with priority over Mr. Samuels's registration; if not, his common law rights well predate Mr. Samuels's registration. But there is another set of factual disputes too.

### ii.    Was Mr. Summerville a member of The Softones in 2009?

The second critical dispute revolves around Mr. Summerville's status in 2009, when he invited Mr. Samuels to perform with him. As noted, this is important because if Mr. Summerville had left The Softones (or, as Mr. Jackson contends, been fired from the group) before 2009, then he and Mr. Samuels were not authorized to be performing as The Softones—and thus Mr. Samuels cannot have succeeded to any Softones trademarks after Mr. Summerville died in 2012. On this issue too, there is evidence supporting each side.

Mr. Jackson contends Mr. Summerville had been fired, and has provided supporting declarations as evidence. Mr. Jackson states in his declaration that Mr. Summerville "died in 2012 although he had been dismissed from the group several years earlier." ECF No. 63-10 ¶ 15. Ms. Jackson Hodges further states in her declaration that she began booking The Softones in 2007 and that the group consisted only of Brown, Jackson, and Elton Lynch at that time. ECF No. 63-7 ¶ 4.

In contrast, Mr. Samuels contends that Mr. Summerville had never been "fired" but rather remained part of the true Softones during the period in question (roughly 2006–2012). Mr. Samuels states that he was "invited to join 'The Softones' by Byron Summerville in 2009," ECF No. 67 at 1, at least implying that Mr. Summerville was in fact part of "The Softones" in 2009. *See also, e.g.*, ECF No. 70-2 at 17 (Mr. Samuels

explaining in his deposition that he did not include original Softones members in his trademark registration application because "[w]hatever I do for the trademark, . . . it be mainly for Byron Summerville. Summerville was the one who got me started in this. . . . If I was to include anybody, it would be a member of Summerville's family."). The upshot of that perspective, if true, is that it is *Mr. Samuels* (along with Mr. Summerville) who was performing as the true Softones during that period.

In short, there is evidence from which a reasonable jury could either conclude that Mr. Summerville had been fired before 2009 (which would entitle Mr. Jackson to prevail in his claims against Mr. Samuels), or that Mr. Summerville had not been fired (which would mean Mr. Jackson *might* not prevail[7]). This dispute, together with the

---

[7] Even if Mr. Summerville had not been fired and Mr. Jackson *did* leave The Softones, Mr. Jackson might still prevail, because there is also a question of whether Mr. Samuels would have gained any rights to The Softones upon Mr. Summerville's death in 2012. Mr. Samuels claims he has been performing as The Softones continuously since Mr. Summerville's death. *See* ECF No. 41 ¶ 8. But Mr. Samuels has not submitted any documentary evidence showing his performances between 2012–2021, whereas Mr. Jackson has. If Mr. Jackson's The Softones performed continuously through this period and Mr. Samuels's The Softones did not, it is possible that Mr. Samuels's The Softones abandoned its rights, and Mr. Jackson regained common law rights via a new version of the group that would still pre-date Mr. Samuels's 2021 registration.

Alternatively, even if Mr. Samuels's The Softones *was* performing from 2012–2021, that would mean his control of the Softones mark began at roughly the same time as Mr. Jackson's The Softones group started. As explained above, Mr. Jackson's documentary record showing his Softones performances picks back up in 2013. *See* ECF No. 63-11 at 4. Mr. Samuels testified that, prior to Mr. Summerville's death in 2012, he was merely a "work-for-hire." ECF No. 70-2 at 7. That means that prior to 2012, he may not have had common law rights in The Softones—as essentially an independent contractor, he likely would not have been in a position to "control[] the quality and reputation of the band" and make "business decisions." *Commodores*, 879 F.3d at 1133. So if Mr. Samuels and Mr. Jackson both started *controlling* separate Softones groups in roughly 2012-2013, it is possible (depending upon how the facts unfold at trial) that neither has a senior claim through prior use. That scenario would require the Court to look to a separate legal

dispute about whether Mr. Jackson left the group sometime before 2009, means that neither party has shown that he is entitled to summary judgment.

### 4.    A sidenote: "abandonment"

In the course of arguing that he remained a Softone during the critical period, Mr. Jackson argues that even if he did not perform with The Softones for an extended period of time, he did not *abandon* his right to enforce the Softones mark. ECF No. 70 at 2–5. The Fourth Circuit has recently clarified that the Lanham Act's statutory abandonment test applies to common law trademarks. *See Simply Wireless, Inc. v. T-Mobile US, Inc.*, 115 F.4th 266, 284 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1898 (2025) ("[W]hen common law ownership of a trademark has been established, the § 1127 statutory abandonment test is the only proper inquiry for a judicial assessment of whether ownership rights in a trademark have been lost."). Under the abandonment test, "three years of nonuse of a valid common law trademark creates a rebuttable presumption of abandonment. At that point, the burden shifts to the putative owner of the trademark . . . to demonstrate that it intended to resume use of its trademark, and that such intention was formed during the three-year presumption period." *Id.* at 278. The original owner must intend to resume use "in the reasonably foreseeable future

framework that other authorities have outlined in situations where band members have equal-in-time but competing claims to a mark. *See Crystal Ent. & Filmworks*, 643 F.3d at 1322 ("Because [Plaintiff] failed to prove that it first appropriated the . . . mark, the district court was required to determine the owner of the mark where prior ownership by one of several claimants cannot be established. . . . To determine ownership in a case of this kind, a court must first identify that quality or characteristic for which the group is known by the public. It then may proceed to the second step of the ownership inquiry, namely, who controls that quality or characteristic.") (quoting *Bell v. Streetwise Records*, 640 F. Supp. at 581).

rather than at some unspecified future date." *Id.* (quoting *Emergency One*, 228 F.3d at 537).

But here, abandonment is not a directly applicable doctrine. Abandonment entails "non-use of [a mark *by the legal owner*." *Emergency One*, 228 F.3d at (emphasis added, quoting *Stetson v. Howard D. Wolf & Assocs.*, 955 F.2d 847, 850 (2d Cir. 1992)). It involves discontinued use of a mark itself, after which the mark "returns to the public domain." *George & Co. LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 400 (4th Cir. 2009). Neither party here contends that the Softones mark was abandoned by its legal owner, The Softones. Rather, Mr. Samuels's contention is that Mr. Jackson left The Softones in or before 2006, and the band continued with other personnel, including Mr. Summerville, Mr. Easley, and eventually Mr. Samuels. Thus, the dispute here is not over whether Mr. Jackson (or anyone else) abandoned the mark, but rather whether Mr. Jackson lost the right to enforce the mark by leaving The Softones. *See Commodores*, 879 F.3d at 1136 ("Our conclusions about the relevance of McClary [the departing member] leaving the band have nothing to do with whether or not he abandoned his rights to the marks in question. We need not determine today whether or not McClary at some time abandoned his ownership of the marks. Instead, we determine that he does not have the rights to use the marks but that the marks are otherwise valid."). To be sure, a number of the principles underlying the abandonment doctrine overlap conceptually with the principles relevant to whether Mr. Jackson or Mr. Summerville "left" The Softones. But strictly speaking, and construing the evidence in the light most

favorable to Mr. Samuels, the legal owner of the Softones mark—i.e., The Softones ensemble—never stopped using the mark, so the *mark itself* was never abandoned.[8]

## B.    The Jackson–Blue Dolphin dispute

Although Mr. Jackson's claims primarily concern Mr. Samuels, he has also sued the Blue Dolphin, a restaurant that advertised one of Mr. Samuels's "Softones" performances. The dispute between Mr. Jackson and the Blue Dolphin also has spawned cross-motions for summary judgment.

As for Mr. Jackson's motion, his claims against the Blue Dolphin depend on his ownership of a pre-existing common law trademark that Mr. Samuels infringed. Because the Court has concluded that genuine factual disputes preclude adjudication at this stage of which party is the rightful owner of the Softones trademark, it will also deny the motion against Blue Dolphin for the same reasons.

That leaves Blue Dolphin's motion for summary judgment. As explained above, Mr. Samuels's summary judgment motion is denied because, construing the record in the light most favorable to Mr. Jackson, Mr. Jackson owned a common law trademark that was infringed by Mr. Samuels. Even after incorporating that argument into the analysis of Blue Dolphin's motion, however, that still leaves the question of whether the Blue Dolphin can be liable for advertising Mr. Samuels's Softones group.

---

[8] Mr. Jackson also argues that, if Mr. Samuels's version of events is credited, his registration is still subject to cancellation because Mr. Samuels did not include the other members of his version of The Softones band. ECF No. 70 at 5–10. But Mr. Jackson has sued for claims of infringement and cancellation based on *his* prior common law claim to the mark. Thus, for purposes of his summary judgment motion, the primary issue is the viability of Mr. Jackson's common law right, not other potential issues with Mr. Samuels's registration.

The central dispute between Blue Dolphin and Mr. Jackson concerns the "use in commerce" element of the infringement test because Blue Dolphin argues that it cannot be liable merely for advertising Mr. Samuels's Softones. In its opposition and cross-motion for summary judgment, Blue Dolphin did "not dispute in any material way the allegations of fact contained in Plaintiff's Motion for Summary Judgment." ECF No. 65-1 at 1. Instead, Blue Dolphin argues that even if Mr. Samuels is liable for trademark infringement, Blue Dolphin cannot be liable for trademark infringement for advertising and hosting Samuels's Softones because secondary vendor liability does not apply in the trademark context. *Id.* at 2–4. In his reply, Mr. Jackson confirmed that he is only suing Blue Dolphin directly for its infringing advertisements, not secondarily for hosting Mr. Samuels's Softones. ECF No. 66 at 8 ("Plaintiff submits that the Blue Dolphin is liable for its advertising, not for its hosting").

It is the Blue Dolphin's own advertisements, not Mr. Samuels's performances, that form the basis of Mr. Jackson's claims against the Blue Dolphin. Thus, the Court need not evaluate the Blue Dolphin's potential contributory or vicarious liability. *See id.*; *see also Rosetta Stone*, 676 F.3d at 163 ("Contributory infringement" imposes liability "upon those who facilitate or encouragement infringement" by others) & 165 ("'Vicarious liability' in the trademark context is essentially the same as in the tort context: the plaintiff seeks to impose liability based on the defendant's relationship with a third party tortfeasor."). Mr. Jackson is not pressing these theories of liability.

Blue Dolphin's publication of advertisements using The Softones mark is a use in commerce sufficient to satisfy the elements of a direct trademark infringement claim. Under the Lanham Act, a mark is used in commerce on services "when it is used or displayed in the sale *or advertising* of services and the services are rendered in

commerce." 15 U.S.C. § 1127 (emphasis added); *see also Seguros R. Vasquez, Inc. v. Aguirre*, Case No. 19-cv-1484-TDC, 2020 WL 3447754, at *3 (D. Md. June 24, 2020) ("The use of a trademark in a Google advertisement . . . plainly can support a Lanham Act trademark infringement claim."); *First Capitol Consulting, Inc. v. NetTax, LLC, et al.*, Case No. 23-cv-7837, 2025 WL 3692147 (C.D. Cal. Dec. 16, 2025) ("Courts have held that the use of a trademark on social media and in business communications satisfies the 'use in commerce' element of a Lanham Act claim."). Construing the evidence in the light most favorable to Mr. Jackson, a reasonable factfinder could conclude that Blue Dolphin used The Softones mark in a Facebook post seemingly designed to encourage customers to spend money on food at the restaurant during Mr. Samuels's performances. ECF No. 63-4. There also is evidence from which a reasonable factfinder could conclude that Blue Dolphin's use of the mark was likely to cause confusion with the common law Softones trademark allegedly belonging to Mr. Jackson. Blue Dolphin is not entitled to summary judgment on the basis of its advertising argument.

Although the Court will deny Blue Dolphin's motion for summary judgment on liability, the record indicates that even if Mr. Jackson eventually prevails on liability for Blue Dolphin's infringement, any damages likely would be minimal. It appears undisputed that Blue Dolphin relied in good faith on Mr. Samuels's promoter's representations about the trademarks—after all, Mr. Samuels had a federal registration for the marks. *See* ECF No. 4-6 at 2 (Blue Dolphin responding to counsel for Mr. Jackson by writing "I have forwarded all communication [t]o the promoter who says the artist has trademarked the name?"). It also is undisputed that Blue Dolphin took down the offending advertisements once it was contacted by counsel for Mr. Jackson (and after accidentally re-posting the Facebook post, Blue Dolphin took it down once more).

*Id.* at 3 (Blue Dolphin employee writing to counsel for Mr. Jackson, "I apologize [the advertisement] was posted by my granddaughter in error [a]nd was taken down already. I accept responsibility for [h]er actions [and] I assure [you] it was not intentional[.] She was not aware of any pending litigation"); ECF No. 4 ¶ 79 (Mr. Jackson acknowledging in his complaint that "the infringing advertisement appears to have been removed"). To be sure, a finding of willfulness is "not a prerequisite for an award of profits in infringement cases." *Variety Stores, Inc. v. Walmart Inc.*, 852 F. App'x 711 (4th Cir. 2021). And, unlike in the copyright context, a *de minimis* defense has not been recognized in trademark law. *See Jalinski Advisory Grp., Inc. v. JBL Fin. Servs. Inc.*, Case No. 19-cv-1914-DDN, 2022 WL 4546895, at *4 (E.D. Mo. Sept. 29, 2022). That said, Blue Dolphin's seeming good faith and its minimal actual use of the asserted trademark would not likely amount to much in the way of damages, even if Mr. Jackson prevails on liability. *See Romag Fasteners, Inc v. Fossil, Inc.*, 590 U.S. 212, 219 (2020) ("[W]e do not doubt that a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate."). Nonetheless, because its Facebook posts did constitute trademark infringement if the evidence is construed in Mr. Jackson's favor, the Court will deny Blue Dolphin's motion for summary judgment.

## IV. CONCLUSION

Because there are several material factual issues related to the common law ownership of the Softones trademark that must be resolved before any party can prevail, the Court will deny the motions for summary judgment. A separate order will follow.

Date:  February 13, 2026

_____

*/s/*

Adam B. Abelson
United States District Judge