**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

STEPHEN JACKSON,
*Plaintiff*,
v.
LORENZO SAMUELS,
*Defendant*.

Case No. 24-cv-741-ABA

**MEMORANDUM OPINION**

Plaintiff Steven Jackson has sued Defendant Lorenzo Samuels for unlawfully infringing his common law trademark rights related to a vocal ensemble, The Softones. Mr. Jackson contends that he has been a member of The Softones continuously since its founding over 50 years ago, and that Mr. Samuels has been operating an unauthorized version of the group using the Softones name. Mr. Samuels, who represents himself in this case, obtained trademark registrations connected to the Softones name in 2023. He contends that Mr. Jackson left The Softones in the early 2000s, thus extinguishing any common law rights that Mr. Jackson previously held. Mr. Samuels asserts that this fact, combined with his registrations and prior use of the name, make his group the rightful Softones.

This Court issued a memorandum opinion denying both parties' motions for summary judgment. *Jackson v. Samuels*, 820 F. Supp. 3d 380 (D. Md. 2026). The Court concluded that genuine issues of material fact remained, most important among them whether Mr. Jackson left The Softones. The Court also held that the same issues of material fact precluded summary judgment for or against another Defendant, a seafood restaurant called The Blue Dolphin. Mr. Jackson and The Blue Dolphin have since settled their dispute. ECF Nos. 115, 116.

The parties—now Mr. Jackson and Mr. Samuels only—elected a bench trial. The Court held that trial over 3 days, and heard testimony from the parties as well as several other witnesses. This memorandum constitutes the Court's findings of facts and conclusions of law upon careful consideration of the evidence presented at the trial. *See* Fed. R. Civ. P. 52(a) ("In an action tried on the facts without a jury . . ., the court must find the facts specially and state its conclusions of law separately.").

For the reasons stated below, the Court concludes that Mr. Jackson has established by a preponderance of the evidence that he owns the trademark rights in the Softones name, and that Mr. Samuels's registrations are subject to cancellation. In summary, this conclusion follows from a single fact: Mr. Jackson did not leave The Softones. Because he did not leave the ensemble, he remained a holder of The Softones' trademark rights under the legal framework for ownership of trademark rights in music ensembles that the Court articulated in its prior opinion. Because Mr. Jackson's common law trademark rights in The Softones pre-dated Mr. Samuels's use and his registrations, the registrations are invalid.

## I. FINDINGS OF FACT

### A. Mr. Jackson's Softones

The Softones were established in the late 1960s. ECF No. 117 at 25 (testimony of Steven Jackson). Though the roster was in some flux around that time due to the Vietnam War, the group solidified eventually in the early 1970s with Marvin Brown, Steven Jackson, Elton Lynch, and Byron Summerville. *Id.* at 25–27; ECF No. 118 at 34–35 (testimony of Willy Bennett, who was a backing musician in and sometimes manager of The Softones). Mr. Brown recruited Mr. Lynch, and Mr. Jackson recruited Mr.

Summerville. ECF No. 117 at 26–27. The Softones also initially included a fifth member, Matthew Fenwicks, but he was only in the group for a short time. *Id.* at 27.

The group began to perform publicly and gained a local reputation in the Edmonson Village neighborhood of Baltimore. *Id.* In approximately 1971, The Softones acquired new representation, A&D Promotions, and their musical profile began to rise. *Id.* at 28–30. The ensemble released its first record, The Softones, in 1973. *Id.* at 31; Ex. P4-A. On that album, The Softones personnel are listed as Marvin Brown, Steven Jackson, Elton Lynch, and Byron Summerville. ECF No. 117 at 31–32; P4-A

In approximately 1975, A&D came to Brown, Lynch, and Jackson and informed them that Summerville was attempting to negotiate deals for himself, separate from the group. ECF No. 117 at 33–35. Brown, Lynch, and Jackson discussed the issue and determined that it was a breach of their trust, and that they would "let [Mr. Summerville] go" from the group. *Id.* at 34. Mr. Summerville was subsequently "released from [his] contract" with A&D Promotions. *Id.* at 35. The Softones' next studio album was, "Black Magic," in 1977. ECF No. 117 at 37; Ex. P4-B. The Softones' albums, most of which were shown as exhibits, corroborate Mr. Jackson's testimony: for example, the personnel on the first album from 1973 was Jackson, Brown, Lynch, and Summerville, Ex. P4-A; but only Jackson, Brown, and Lynch were listed on the second album released in 1977—not Summerville. Ex. P4-B.

The Softones became increasingly successful in these years, and they performed and toured nationally and internationally. Their international tours consisted primarily of Jackson, Brown, and Lynch, with some backing musicians. ECF No. 117 at 38–40; Ex. P1-C (1975 article in the Baltimore Afro-American discussing The Softones' visit to Japan and listing only Jackson, Brown, and Lynch). The Softones recorded a live album

in Japan, "Feeling The Softones/Live!", that also included only Jackson, Brown, and Lynch, and was only released in Japan in 1977. ECF No. 117 at 42; Ex. P4-C. Following their international tour, The Softones continued to perform as just Jackson, Brown, and Lynch. ECF No. 117 at 44, 46–47. The Softones' third studio album, "Brand New Day," was released in 1978, and also featured only Jackson, Brown, and Lynch. Ex. P4-D.

In 1980, The Softones released a collaboration album with the ensemble First Class titled "Together." ECF No. 117 at 86, 89; Ex. P4-E. During this time period, The Softones performed frequently, approximately every week. ECF No. 117 at 47; Ex. P1-T (newspaper article reflecting 1980 concert listing the trio personnel without Mr. Summerville). The Softones also made various film and television appearances around this time, including an ad for Baltimore weatherman Bob Turk set to The Temptations song "My Girl." ECF No. 117 at 47, 54–55; *see also id.* at 54 (discussing The Softones' appearance in the 1982 film "Diner," which was cut out in the final edit).

During the 1980s, The Softones started to experiment with music in a more upbeat, funk style. ECF No. 117 at 48. They released an album in this style in 1983 and used a different name to signal the change in approach, "The Tones." ECF No. 117 at 48–50; Ex. P4-I (album "Here's to You" by "The Tones" in 1983). Mr. Summerville was not on this album; again, only Jackson, Brown, and Lynch were. The album did not achieve widespread popularity, and the group quickly returned to The Softones name. ECF No. 117 at 50; P5-B (video from "The Shakedown" show in 1986 in which Elton Lynch states that the band changed its name back to "The Softones").

At some point during the mid-1980s, The Softones also briefly included two new members: Kevin Muldrow and Jimmy Holland. P5-B; ECF No. 117 at 51–53; ECF No. 119 at 123–25 (Mr. Jackson's testimony while called as a rebuttal witness by Mr.

Samuels). The two new members were only with the group for approximately 6 months. ECF No. 117 at 53; ECF No. 119 at 124. During approximately this same time period, Marvin Brown left Baltimore to complete additional education (it was not clear from the trial testimony what degree he was pursuing) and sometimes did not perform with The Softones. ECF No. 119 at 124.

From approximately 1986 to 1995, The Softones still performed regularly, including performances across the United States and Canada. ECF No. 117 at 56–57. In approximately 1995, The Softones decided to allow Mr. Summerville back into the group on a trial basis for recording projects. *Id.* at 56–57. The Softones recorded albums in 1997, "The Softones . . . At Last," and 1998, "Carla My Life," with Jackson, Brown, Lynch, and Summerville. *Id.* at 57–59.Ex. Ex. P4-G; Ex. P4-H. Mr. Summerville continued to perform with The Softones after these albums were released, though still on a provisional basis. ECF No. 117 at 58.

Mr. Summerville's second association with the band ended similarly to his first. Mr. Jackson became aware that Mr. Summerville was booking gigs on behalf of The Softones without the group's knowledge. ECF No. 117 at 59. Mr. Jackson also received a bill related to merchandise that reflected a deal Mr. Summerville entered without the other members' knowledge. ECF No. 117 at 59–61 After discussion, Jackson, Lynch, and Brown determined that this conduct was unacceptable, and dismissed Mr. Summerville from the group again, in approximately 1999. ECF No. 117 at 59–62.

The Softones continued to perform after Mr. Summerville's departure, in the configuration of Jackson, Brown, and Lynch (though there was one period in which Lynch did not perform with the group due to illness, ECF No. 117 at 124). In

approximately 2005,[1] at a time when opportunities for The Softones were waning, Brown and Jackson began to sing with another musician, Johnnie Johnson, as The Fonics, a Delfonics cover group. ECF No. 117 at 62–63, 117–118; ECF No. 118 at 17, 32 (testimony of Johnnie Johnson); Ex. D1-L (video of Brown, Jackson, and Johnson performing as The Fonics). Johnson was also a member of The Delfonics, and viewed The Fonics as a "merging" of The Softones and The Delfonics. ECF No. 118 at 17. But The Fonics project did not signal an end to The Softones. ECF No. 118 at 32 (Mr. Johnson's testimony affirming that The Delfonics and The Softones both continued to "maintain their independence" and "didn't shut down" while The Fonics were active). In other words, although the opportunities for The Softones may have been fewer and farther between, Brown, Jackson, and Lynch continued to perform occasionally as The Softones during the time that Brown and Jackson were performing with Johnson as The Fonics (which was approximately 2005–2011). *See id.*; ECF No. 117 at 118, 138 (testimony of The Softones' manager Elizabeth Jackson Hodges that she booked shows for The Softones starting in 2005); ECF No. 118 at 37 (testimony of Mr. Bennett, a former manager of both The Softones and The Delfonics, that Mr. Jackson's iteration of The Softones "absolutely" performed during that period). Mr. Summerville did not perform with Mr. Jackson's The Softones during this time. ECF No. 117 at 135 (Ms.

[1] Initially, in his direct examination, Mr. Jackson testified that his association with The Fonics began in 2012. ECF No. 117 at 63. This appears to have been a mistake, as he noted during cross-examination. *Id.* at 117 ("Q. 2005, who were you singing with? A. 2005 I'm going to say I was with The Softones and the Fonics project . . . we were starting the Fonics project around 2005. Q. You already said the Fonics started in 2012. A. I might have my dates mixed up."). Generally, both Mr. Jackson *and* Mr. Samuels at times got names and dates confused, and both noted this propensity in their testimony. *See* ECF No. 119 at 86, 114–15. The Court's findings as to the chronology is based upon the witness testimony as a whole, as well as the documentary record.

Jackson-Hodges: "I started working with The Softones in 2005 as a booking agent and later . . . around 2012 as a manger. I never once met Byron Summerville. I never spoke with him on the phone").

In approximately 2011, opportunities with The Softones began to pick back up, so Brown and Jackson re-focused their efforts on The Softones. In that year, Jackson, Brown, and Lynch received a "Congressional Achievement Award" from Congressmen Elijah Cummings and Dutch Ruppersberger in recognition of their achievement with The Softones. ECF No. 117 at 66–67; Ex. P8-A; Ex. P8-B. The Softones, in this same line-up, continued to perform, with activities ramping up after the 2011–2012 timeframe. ECF No. 117 at 69–80, 127–132; *see, e.g.*, Ex. P9-B (image from performance at Pikesville Armory in 2012); P14-C (article about 2014 radio performance); Ex. P21-A (2019 performance contract); Ex. P26-A (2022 performance contract); P28-A (2025 performance contract).[2]

Mr. Brown died in 2020, and Mr. Lynch in 2022. Currently, Mr. Jackson continues performing with The Softones in a line-up with three additional members:

---

[2] As the Court noted in its summary judgment opinion, there appeared to be a gap in the documentary record of performance contracts for The Softones between 2006 and 2012, which the Court noted could potentially support Mr. Samuels's assertion that Mr. Jackson left the group around this time. *Jackson*, 820 F. Supp. 3d. at 393. Mr. Jackson did not submit any performance contracts for this time period at trial, but the testimony of Ms. Jackson-Hodges, The Softones' manager, helped explain the gap. She testified, as Mr. Jackson did, that performance opportunities for The Softones were slow during this period. Ms. Jackson-Hodges further explained that The Softones would only have formal contracts for larger shows, whereas they planned smaller shows based on handshake agreements. ECF No. 117 at 137. Thus, the absence of performance contracts from 2006–2012 appears to be explained by the fact that The Softones did not have major shows during this period, rather than having no shows at all. Ms. Jackson-Hodges both specifically testified that The Softones—as Jackson, Brown, and Lynch—were performing during this period. *See* ECF No. 117 at 138.

Johnnie Johnson, Michael Muse, and Marvin Brown, Jr. ECF No. 117 at 78–82, 132; P28-A.

**B. Mr. Summerville's "Softones"**

In approximately 2004, during roughly the same time period in which Mr. Jackson and Mr. Brown began to perform with The Fonics, Mr. Summerville began to form a new group that he also referred to as "The Softones." ECF No. 117 at 143; ECF No. 118 at 42 (Mr. Bennett's testimony that Mr. Summerville told him he "wanted to take the group into a gospel direction"). Mr. Summerville's group consisted of himself, Precious "Man" Hale, Harry Easley, and Michael King. ECF No. 117 at 147, 152. Mr. Easley testified at trial.[3] He testified that the group also initially included Mr. Lynch for a short time, but that he was replaced by Michael King. *Id.* at 147–148. Mr. Easley also testified that it was his understanding that Mr. Brown and Mr. Jackson had left The Softones. *Id.* at 151–52. Mr. Easley also stated that while he was with this iteration of

[3] Mr. Jackson filed a motion in limine to exclude Mr. Easley's testimony because Mr. Samuels failed to disclose him as a witness in discovery or pretrial submissions. ECF No. 91. As Mr. Jackson outlines in that motion, Mr. Samuels was given numerous opportunities to identify relevant witnesses but repeatedly failed to identify Mr. Easley, whom he was aware of since the beginning of the litigation. *Id.* at 5–8. But in light of Mr. Samuels' pro se status, the Court reserved ruling on the motion prior to trial, and allowed Mr. Easley to testify. ECF No. 96 at 1. And the Court now concludes, for the reasons explained herein, that Mr. Jackson is entitled to relief even considering Mr. Easley's testimony. Thus, the Court will deny Mr. Jackson's motion as moot.

Separately, Mr. Jackson also filed a motion requesting an order to show cause why Mr. Samuels should not be sanctioned for refusing to participate in the process of preparing the pretrial order. ECF No. 94. The Court reserved ruling on this motion as well. The relief Plaintiff proposed included excluding witnesses or entering default judgment. *Id.* at 5. Since the Court has determined that Mr. Jackson is entitled to relief regardless, this motion is also denied as moot.

The Softones, they once encountered Mr. Jackson and Mr. Brown at a radio station interview at which Mr. Summerville's group was introduced as The Softones. *Id.* at 144–47.

Mr. Jackson testified that he "heard" about Mr. Summerville's (and subsequently Mr. Samuels's) version of The Softones, but did not seriously investigate the group and generally "didn't know what was going on as far as that was concerned." ECF No. 117 at 112–13; *see also* ECF No. 118 at 38 (Mr. Bennett's testimony that he was aware of Mr. Samuels singing under the Softones name, and informed Mr. Brown and Mr. Jackson). Mr. Jackson was also aware that Mr. Summerville had traveled with a group purporting to be The Softones to the Virgin Islands, but took no action to stop Mr. Summerville as that version of the group "sound[ed] like it wasn't adding up to anything." ECF No. 117 at 112–3.

In 2008, Mr. Easley left that group, and recommended Mr. Samuels to replace himself. ECF No. 117 at 150–51. Mr. Samuels had seen the group perform previously on a few occasions. ECF No. 119 at 60–61. Mr. Samuels was hired into Mr. Summerville's The Softones at that time, and began performing with them in 2009. *Id.* at 62. In approximately 2010, Mr. Summerville moved from Baltimore to North Carolina. ECF No. 118 at 89–90; ECF No. 119 at 66. He stopped regularly performing with this iteration of The Softones at that time, but continued to be involved in managing the group to varying degrees from 2010 until his death in 2012. ECF No. 117 at 121; ECF No. 118 at 88–89; ECF No. 119 at 16–17, 35.

After Mr. Summerville's death, Mr. Samuels took charge of that version of The Softones. ECF No. 119 at 95. Mr. Samuels's The Softones, following Mr. Summerville's departure from the group and eventual death, consisted of himself, Grafton Gray, David

Butler, and Michael King. *Id.* at 69. The group performed approximately once per month at small, local shows. *Id.* at 69–70, 79. In 2015, the group's promoter died, and their performance activities slowed down to roughly two concerts per year. *Id.* at 70–72. Mr. Samuels has continued to perform sporadically with his version of The Softones through the present day, including performances in which the group is billed as The Softones Revue. *Id.* at 41–43; 70–72. In addition to performing as The Softones and The Softones Revue, the ensemble also sometimes bills itself as Class. *Id.* at 46–47, 52.

In 2021, Mr. Samuels applied for trademark registrations in the word marks THE SOFTONES and THE SOFTONES REVUE. ECF No. 118 at 79–84; P-29 (prosecution history for THE SOFTONES); P-30 (prosecution history for THE SOFTONES REVUE). Mr. Samuels received both registrations in 2023. P-29 at 1; P-30 at 1.

In 2022, Mr. Jackson and Mr. Samuels's paths crossed directly. Mr. Jackson heard about a concert at Franklin Square Park in Baltimore at which he understood Mr. Samuels to be performing with Class, which was "doing a Softones Revue," *i.e.*, a Softones tribute show. ECF No. 117 at 89–90; D1-L (video of part of the performance); *see also* ECF No. 118 at 5–8 (Mr. Johnson, who also attended the show, testifying that he understood the concert to be "a type of tribute"); Ex. P43-A (social media advertisement listing Mr. Samuels's group as "Class (Softones Revue)"); Ex. P36-B (advertisement by Samuels and his group introducing themselves as Class and stating that they would be performing "a special tribute to the mighty Softones"). Mr. Samuels's group invited Mr. Jackson on stage to sing with them. ECF No. 117 at 90–91. After the show, Mr. Jackson texted Mr. Samuels thanking him for inviting him on stage and stating that "[t]he Softones revue should always have high standards." ECF No. 117 at 92–93.

## II. CONCLUSIONS OF LAW

As the Court explained in its memorandum opinion at the summary judgment stage, Mr. Jackson must prove four elements to prevail on his trademark infringement and cancellation claims: "(1) that [he] owns a valid mark; (2) that the defendant used the mark 'in commerce' and without plaintiff's authorization; (3) that the defendant used the mark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (4) that the defendant's use of the mark is likely to confuse consumers." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012) (quoting 15 U.S.C. § 1114(a)); *see also Jackson*, 820 F. Supp. 3d at 387–88. Before trial, Defendant Samuels stipulated to facts that established elements 2, 3, and 4 of this test. ECF No. 101 at 8–9 ¶¶ 1–3. Thus, the only issue for trial was element 1: whether Mr. Jackson held common law ownership of The Softones trademark that gave him priority over Mr. Samuels's registration.

The Court outlined the legal standards for establishing trademark ownership in the context of music ensembles in its prior memorandum opinion. Rather than repeat itself here at length, the Court incorporates the legal framework articulated in that opinion in its entirety. The most relevant portion of the standard is as follows:

> [I]n the absence of an agreement to the contrary, a music ensemble's trademark rights remain with the ensemble itself. *See Robi* [*v. Reed*, 173 F.3d 736, 739–40 (9th Cir. 1999)]; *Commodores* [*Ent. Corp v. McClary*, 879 F.3d 1114, 1131–32 (11th Cir. 2018)]. The right to enforce the trademark stays with those individuals currently affiliated with the ensemble who "control[ ] the quality and reputation of the band" and have authority over "performances and business decisions." *Commodores*, 879 F.3d at 1133. But the individual trademark rights of the members do not travel with them. Instead, they are akin to a contingent property right that exists only as long

> as a band member is still in the group. Thus, when a musician leaves a band, they "[leave] behind [their] common-law rights to the marks." *Commodores*, 879 F.3d at 1121; *see also Robi*, 173 F.3d at 739 ("[M]embers of a group do not retain rights to use the group's name when they leave the group.").

*Jackson*, 820 F. Supp. 3d at 390.

As the Court explained previously, the key question in this case, applying those standards, is whether Mr. Summerville and/or Mr. Jackson "left" The Softones. *Id.* at 392–95. If Mr. Jackson left The Softones, as Mr. Samuels claims he did to join The Fonics in approximately 2005, then he may not be able to claim a pre-existing common law mark in The Softones name under the framework articulated above (though, as previously explained, even if Mr. Jackson had left, he may still have been able to show a superior claim to the trademark, *see id.* at 394 n.7). If Mr. Jackson never left The Softones, however, and instead performed with them since approximately their founding through the present day as he claimed, then he would hold common law ownership under the music ensemble trademark cases. *See Robi*, 173 F.3d at 740 ("[A] person who remains continuously involved with the group and is in a position to control the quality of its services retains the right to use . . . the mark[.]"). There was also the question of Mr. Summerville: if Mr. Summerville had left The Softones prior to inviting Mr. Samuels to join, then the version of the band that Mr. Samuels joined was not *The* Softones either, which would complicate matters further. *See Jackson*, 820 F. Supp. 3d at 394–95.

Because the question of "leaving the band" had such relevance for the outcome of the case, the Court also articulated how the caselaw had analyzed whether a member "left" an ensemble for purposes of common law trademark ownership:

> The cases that have confronted this issue generally look to factors such as whether a musician manifests an explicit intent to leave; ceases creative activities with the band such as rehearsing, songwriting, performing, and recording; and/or no longer participates in business decisions. For example, in *Commodores*, the court held that Mr. McClary did not have a right to perform as a "Commodore" because he "did not join the group to make business decisions about performance schedules or recordings," "stopped writing songs with the group," and "was not involved with the group's decisions about performances, whether about the songs to be performed, the personnel to be involved, or the production details of the shows." 879 F.3d at 1133–1134. In *Leftenant* [*v. Blackmon*], the court held that various band members lost their common law trademark rights by ceasing to perform or record with the band, "undisputed[ly] resign[ing]," and/or having "no involvement with the management" of the band. 2023 WL 362663, at *3–5 [(D. Nev. Jan. 23, 2023)]. On the other end of the spectrum, original band members who have remained continuously with the band and still participate in creative and business decisions will almost always have the right to perform under the band's name and enforce the band's trademarks. *See Robi*, 173 F.3d at 740; *Commodores*, 879 F.3d at 1132–133.

*Jackson*, 820 F. Supp. 3d at 391–92.

Though the Court found at the summary judgment stage that there were disputed issues of material fact concerning whether Mr. Jackson and/or Mr. Summerville had left The Softones, at the trial stage and applying the preponderance of the evidence standard, the answer at least as to Mr. Jackson is clear: he did not leave The Softones.

There was trial evidence in both directions on this issue. In particular, Mr. Easely's statements regarding his meeting with Mr. Jackson and Mr. Brown at the radio station, as well as the fact that he was performing with Mr. Lynch and was told that Jackson and Brown had left, could give a reasonable factfinder some pause. But ultimately, all of the witnesses with direct, personal knowledge concerning whether Mr.

Jackson left The Softones between 2005 and 2011—meaning, as explained above, whether he ceased all activities with the group and/or manifested a clear intent to quit the group—testified that Mr. Jackson did not leave. Those witnesses were Mr. Jackson himself, who testified that he did not leave the group; Mr. Johnson, who testified that The Softones continued to perform in parallel to The Fonics; Mr. Bennett, who testified that Mr. Jackson's The Softones "absolutely" performed between 2006 and 2012; and Ms. Jackson-Hodges, who was a booking agent for The Softones at that time and testified that she did occasionally book shows for the group. Ms. Jackson-Hodges's testimony was particular compelling: she began booking for The Softones in 2005, the start of the contested period, so she would have a clear reason to remember the group performing in those years. In sum, the witnesses with personal knowledge stated that Mr. Jackson did not leave the group, and while his performance activities with The Softones decreased during that period, The Softones did still perform as Jackson, Brown, and Lynch. While the documentary record is lacking concerning Mr. Jackson's Softones activities in the 2005–2011 period, the Court found those four witnesses credible, and regardless there was also no documentary evidence on Mr. Samuels's side indicating that Mr. Jackson did leave.

In addition, Mr. Jackson's version of events best comports with common sense. *See G. W. Aru, LLC v. W. R. Grace & Co.-Conn.*, 803 F. Supp. 3d 346, 395 n.50 (D. Md. 2025) ("[W]hen the Court sits as a trier of fact, it is entitled to use its common sense, just as it regularly instructs jurors to do."). The Court does not believe it likely that Mr. Jackson—after over three decades of performances and recordings—would suddenly leave The Softones to join a Delfonics cover band. Instead, the far likelier inference is that when work slowed down for The Softones, Mr. Jackson put that group on the back

burner and devoted more time to The Fonics. Given that Mr. Jackson did continue to perform occasionally as The Softones with Lynch and Brown, his actions do not equate to leaving The Softones.

The Court's reasoning should not be taken to indicate that Mr. Samuels or Mr. Easely were not also credible witnesses. But they had no direct, first-hand knowledge of Mr. Jackson's activities or intent. *See* ECF No. 119 at 6 (Mr. Samuels testifying that he did not observe any Softones performances until he joined the group), 48 (Q. "Do you have any personal knowledge as to how Steve Jackson, Marvin Brown, and Elton Lynch's iteration of The Softones operated?" Mr. Samuels: "Not at all."); ECF No. 101 at 9 (stipulation that Mr. Samuels does "not know whether Steve Jackson and Marvin Brown performed as The Softones from 2006 to 2012"). Instead, their testimony involved second-hand information indicating that Mr. Jackson had left. The preponderance of the evidence, particularly given Mr. Jackson's first-hand account supported by three other witnesses who had personal knowledge, indicates that Mr. Jackson did not leave The Softones and that his Softones were performing sporadically between 2005–2011.

Mr. Jackson's testimony that he was aware of Mr. Summerville's version of The Softones does not change this conclusion. Mr. Jackson testified that he heard of Mr. Summerville's efforts but did not investigate further or take action to stop them because he believed they would not amount to anything. Mr. Jackson did not testify that he believed Mr. Summerville was organizing the true Softones successor or that he believed Mr. Summerville's ensemble would gain wide-spread popularity and did nothing. Instead, Mr. Jackson stated essentially that he was aware of an unauthorized version of his ensemble but did not bother to take action because he did not think that version

would be successful. Mr. Jackson appears to have ultimately been correct, as his version of The Softones would go on to more performance success and public recognition in the years following 2011. Mr. Jackson's failure to stop Mr. Summerville's group does not establish that he intended to or did leave The Softones. *See Quality Inns Int'l, Inc. v. McDonald's Corp.*, 695 F. Supp. 198, 214 (D. Md. 1988) ("So long as there is no abandonment or estoppel by acquiescence, a trademark owner's tolerance of third-party uses of his marks will not bar enforcement of his rights against an infringing user."); *Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1110 (9th Cir. 2006) ("[T]he trademark owner need not sue in the face of *de minimis* infringement by the junior user."); *Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Credito oriental*, 698 F.3d 9, 23 (1st Cir. 2012) (collecting authorities to support the same proposition).

The testimony and evidence regarding Mr. Jackson's attendance at the park performance in 2022 and subsequent text message do not alter the analysis either. The evidence indicated that Mr. Jackson (and Mr. Johnson) understood this performance to be a tribute to The Softones, not a group purporting to literally be The Softones—especially given that the group was also calling itself Class at that performance and in advertisements. *See* ECF No. 117 at 89; ECF No. 118 at 5; P36-B. Thus Mr. Jackson's encouraging text message to Mr. Samuels after the show was not an acquiescence to Mr. Samuels assuming The Softones' trademark rights.

Finally, Mr. Samuels was not entitled to trademark rights in The Softones through his connection to Byron Summerville. The only direct testimony regarding Mr. Summerville's status with The Softones came from Mr. Jackson, who testified that Mr. Summerville was fired from the band in approximately 1975, rejoined in 1995, and was

fired again in 1999. The documentary record, particularly the progression of line-ups as reflected on album covers and news coverage, supported Mr. Jackson's recollection. Mr. Samuels did not offer any evidence to show that Mr. Summerville was a member of The Softones at any time after 1999. The same legal frameworks for common law ownership that applied to Mr. Jackson also apply to Mr. Summerville. When he left The Softones in approximately 1999, Mr. Summerville did not take partial trademark rights with him. *See Jackson*, 820 F. Supp. 3d at 390–91 (explaining that fragmentary joint ownership of trademark rights is widely disfavored). Thus, even to the extent Mr. Samuels could have "inherited" rights in The Softones by being invited into the group by Mr. Summerville, Mr. Summerville did not have rights in The Softones in 2009 for Mr. Samuels to inherit.

As the Court articulated above and explained in its summary judgment opinion, the finding that Mr. Jackson did not leave The Softones entitles Mr. Jackson to judgment in his favor. Because Mr. Jackson has remained with The Softones from the 1970s until now, he retains common law trademark rights in the ensemble. Those common law rights long pre-date Mr. Samuels's registration applications in 2021. Because Mr. Jackson has established his prior, common law ownership of the trademark at trial, and the other three elements of the infringement claim were not in dispute, the Court finds that Mr. Jackson has prevailed on his infringement claim. And because he has prevailed in showing infringement, the Court will order Mr. Samuels's registrations cancelled as a matter of law and enter an injunction barring him from use of The Softones name. *See U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 523 (4th Cir. 2002) ("A party claiming prior use of a trade or service mark may . . . seek to enjoin a defendant's use of its registered mark and cancel that defendant's registration of the mark. . . . However, before a federal registration may be cancelled, the plaintiff must

prevail in an infringement action.”). Mr. Jackson withdrew his claims for damages at the conclusion of the trial, and now only seeks equitable relief (he also withdrew his claim for cancellation based upon fraud). ECF No. 119 at 139 (“We’re not seeking damages, we’re seeking injunctive relief, cancellation of the registrations[.]”).

## III. CONCLUSION

For the foregoing reasons, the Court concludes that Mr. Jackson is entitled to judgment on his infringement and cancellation claims. In the accompanying order, the Court directs Mr. Jackson to provide proposed language for an injunction regarding Mr. Samuels’s use of the Softones name and cancellation. Mr. Samuels will have an opportunity to respond to Mr. Jackson’s proposals. The Court will subsequently enter a permanent injunction and order of judgment.

Date: September 4, 2026

/s/
Adam B. Abelson
United States District Judge